IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

FILED
97 SEP 12 PM 2:57
U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| INTERGRAPH CORPORATION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | CIVIL ACTION NUMBER |
| ) | |
| ZYDEX, INC., ) | 95-C-2147-NE |
| ) | |
| Defendant. ) | |

ENTERED
SEP 12 1997

**MEMORANDUM OF OPINION ENFORCING SETTLEMENT AGREEMENT**

The Court is now called upon to tell the parties what they meant when they settled this case.

The case was filed on August 8, 1995. The parties seek the dissolution of a partnership between plaintiff Intergraph Corporation and defendant Zydex, Inc., an accounting, declaratory judgment, distribution of partnership assets, and damages for alleged fraud and breach of contract. The case has been characterized by mutual acrimony between the parties' counsel.

In January 1997, the parties stipulated that the case should be mediated and the Court ordered mediation. Doc. 32, 33. The mediator thereafter issued his report:

> The parties have engaged in two multiple day mediation sessions. At the conclusion of the first session, the chief executive officers of the plaintiff and the defendant executed a document entitled "Basis of Agreement." The Mediator, therefore, cannot report that "no agreement was reached" out of concern for the

54

>           rights of either party to maintain that an
>           enforceable agreement concluding the
>           litigation was reached. However, after the
>           second mediation session, the parties were
>           unable to agree upon the terms of a written
>           entry consistent with the document. The
>           mediator has concluded and has informed the
>           parties that further efforts at mediation
>           would be futile.
>                Done this 13th day of June, 1997.

Doc. 38.

## I.  The Settlement Agreement

Zydex has filed, and Intergraph has concurred in, a Motion to Enforce the Settlement Agreement. The parties are in agreement that a settlement has been reached. At issue is a dispositive one page, handwritten "Basis of Agreement," signed by Jim Meadlock, president and chief executive officer ("CEO") of Intergraph and Eduardo P. Zorrilla, president and CEO of Zydex.

The Basis of Agreement reads as follows:

### BASIS OF AGREEMENT

- purchase of Zydex Inc. Stock after distribution of all liquid assets inc. PDS payments

- Total purchase price of

    $24,750,000, payable
        1/3 April 15, 1997
        1/3 secured by PDS
        1/3 secured by LC

- Payments amortized monthly, with interest at 1% less than Foothills

- Royalties stop at April 15, 1997
  PDS to Zydex Eng. For 15 yrs.
  Confidential Agreement

2

Court's Exhibit ("CX") 1. The Agreement was hammered out by Meadlock and Zorrilla personally on February 3, 1997.

By its terms, the Agreement provides that Intergraph will purchase Zydex's stock for $24.750 million. A third of the purchase price was to have been paid in cash on April 15, 1997; another third was to be secured by PDS[1] stock; and the final third was to be secured by a Letter of Credit. Twenty-four equal payments of principal and accrued interest (at a rate 1%) less than the rate Intergraph is charged by its principal lender, Foothills Capital Corporation, are to be made. Royalties to Zydex are to end on April 15, 1997. Zydex is entitled to use PDS for fifteen years. The Agreement is confidential.

## II. The Disputed Issues

The parties differ on five issues: (1) whether the term "secured by PDS" gives to Zydex a first priority security interest in Intergraph's PDS stock until the second third of the purchase price is paid; (2) whether the Letter of Credit is due at closing; (3) whether Zydex's royalty payments are to cease on April 15, without regard to the actual closing date; (4) the method of computation of the 1997 royalty payments to Zydex; and (5) the coverage of Zydex's 15-year license to use PDS.

---

[1] "PDS" is a set of computer software packages relating to an engineering, design, and drafting system. PDS was designed and developed by Zydex. Defendant's Exhibit ("DX") 15, p.2.

III.   Resolution of the Disputed Issues

A.

The language of the Basis of Agreement does not provide that Zydex will have a "first priority security interest" in PDS, or words to that effect.  The Court finds that the parties intended and understood that Zydex's security interest would be subordinate to the existing Foothills Capital Corporation ("Foothills") security interest.

B.

The Court finds that the parties intended that Intergraph would provide the Letter of Credit at the closing.  Accordingly, they made no provision for a deferral of the Letter of Credit.

C.

Based on the clear and unambiguous language of the Basis of Agreement, the Zydex royalties "...stop at April 15, 1997." CX1. To the extent of any latent ambiguity in the Agreement, the Court finds, based on the parol evidence adduced at the hearing, that the parties intended that the royalties would end on April 15.  Both CEOs were aware that they could have linked the cessation of royalty payments to the date of closing.  They both considered and rejected that approach - opting instead for a date certain.

D.

In their Basis of Agreement, the CEOs do not specify the method of payment of Zydex's 1997 royalties.  This troublesome

4

issue is likely the rub which precipitated this lawsuit in the first place. Zydex has vigorously maintained that Intergraph has consistently failed to accurately compute and pay to it the proper royalties due under their Joint Venture Agreement; with equal vigor, Intergraph has denied the claim. The issue before the Court is not whether Zydex could have prevailed on its claim at trial; rather, the issue is whether the CEOs agreed that Intergraph would compute and pay Zydex's 1997 royalties in a manner different from its contested past practice.

Based on the parol evidence, including the testimony of the CEOs, the Court finds the answer to that inquiry to be in the affirmative. The parties intended that the Joint Venture Agreement would be used as the basis for computation of the 1997 royalties. That agreement provides for royalties based on "whatever income Intergraph receives in the licensing of [PDS] software...less [certain] items...that apply to a specific licensing situation...." DX 15, p. 17 §3.8.3

Alternatively, in the absence of an express agreement on the method of computation, the parties contemplated that the method of computation would be that set forth in the Joint Venture Agreement.

Based on the Joint Venture Agreement, as of April 15, 1997, Zydex's royalties had been underpaid by $1,193,281.50.[2] Zydex is due interest on that amount up to the date of this Order.

In referencing "PDS to Zydex Eng[ineering] for 15 years," the CEOs intended to continue Zydex's current rights as they existed under the Joint Venture Agreement - no more and no less. Thus, both the current version and future revisions and repackaging of PDS software packages are covered.

## IV.   Supplemental Provisions

The CEOs agreed to additional terms not set forth in the Basis of Agreement.

The parties agreed that in the one-year period following the date of closing, Edward P. Zorrilla shall not assist Bentley Systems, Inc., Jacobus, Inc., and/or the CAD-Centre (PDMS) by working with them. Otherwise, Zorrilla and his employees (Zi or ZEI) shall not be subject to any non-competitive obligations to Intergraph, to Zydex or to the Intergraph-Zydex Joint Venture. There shall be no other limitations regarding the use by Zorrilla and his employees of their knowledge and expertise.

---

[2] DX 15 reflects that from January 1, 1997, through March 31, 1997, Zydex had been underpaid by $854,301. By April 30, it had been underpaid by $1,532,262. From these figures, the Court has extrapolated the underpayment amount as of April 15.

6

The parties further agreed that after the closing, either on his own part or as part of another company, Zorrilla shall be free to:

- provide consulting services customizing the PDS RDBs

- assist PDS users in their utilization of PDS

- assist PDS users in the translation of PDS projects from one operating system to the other or from one PDS version to another

- develop computer programs complementary to or competing with PDS. However, during the first five years following the date of closing, Zorrilla shall grant to Intergraph a right of first refusal regarding the sales and marketing by Intergraph of any software developed by Zorrilla, or by any company which he controls, whether such software is complementary to or competitive with PDS. The basis for such sales and marketing agreement shall be mutually agreed to between Intergraph and Zorrilla during the forty-five (45) day period following Zorrilla's written offer of the sales and marketing option.

In the one-year period following the date of closing, upon request and on reasonable notice, Zorrilla shall participate in a monthly one-day PDS status meeting in Huntsville, Alabama. Intergraph shall have the right to use any of Zorrilla's ideas or knowledge provided during any such meetings. Intergraph shall not impose any confidentiality restrictions on Zorrilla concerning the matters discussed at these meetings, unless accepted by Zorrilla prior to disclosure of the confidential matters. Where Zorrilla

agrees to confidentiality, immediately after the meeting he shall record in writing the nature of the confidential information.

To the extent that these supplemental provisions conflict with the provisions of the Basis of Agreement, these supplemental provisions shall prevail.

Zorrilla has the right to disclose these additional provisions on a "need to know" basis.

## Conclusion

By separate Order, the Settlement Agreement shall be enforced.

DONE this ____12th____ day of September, 1997.

_____
UNITED STATES DISTRICT JUDGE
U. W. CLEMON

8